UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------X

MARIO SAENZ,

                    Plaintiff,

                                                    16 Civ. 574 (RWS)

          - against -

                                                    OPINION

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                    Defendant.
---------------------------------------------X

A P P E A R A N C E S:



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/10/17

          Attorney for Plaintiff
          OUIMETTE, GOLDSTEIN & ANDREWS, LLP
          100 Crystal Run Road, Suite 112
          Middletown, NY 10941
          By: Scott Goldstein, Esq.


          Attorney for Defendant
          JOON H. KIM
          Acting United States Attorney
          U.S. Attorney's Office, SDNY
          86 Chambers Street
          New York, NY 10007
          By:  Leslie A. Ramirez-Fisher, Esq.

**Sweet, D.J.**

Plaintiff Mario Saenz ("Saenz" or the "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 402, *et seq.* (the "Act"), challenging the determination of Defendant Nancy Berryhill[1], Acting Commissioner of Social Security ("Berryhill," the "Defendant," or the "Commissioner"), to deny his application to the Social Security Administration ("SSA") for monthly disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits. Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. As set forth below, the Plaintiff's motion is denied, and the Commissioner's motion is granted.

## Prior Proceedings

Plaintiff applied for DIB and SSI on June 14, 2012, alleging a disability that began on January 1, 2010. (Social Security Administrative Record (the "R") at 133-42, 153, Dkt.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Berryhill is hereby substituted for former Acting Commissioner Carolyn W. Colvin as the defendant in this action.

13.) On November 8, 2012, the Social Security Administration denied Saenz both requests. (R. at 65-69, 76-81.)

On December 6, 2012, Plaintiff requested a hearing before an administrative law judge ("ALJ"). ALJ Robert Gonzalez heard Plaintiff's case and testimony on October 8, 2013. (R. at 33-64.) On April 9, 2014, the ALJ issued a decision finding Plaintiff not disabled. (R. at 10-26.) Plaintiff filed an appeal of that decision to the Appeals Council on May 8, 2014, which denied Plaintiff's request for review on December 21, 2015. (R. at 1-9.)

On January 26, 2016, Plaintiff timely commenced the present action pursuant to 42 U.S.C. § 405(g). (Dkt. 1.) Plaintiff moved for judgment on the pleadings on September 9, 2016, (Dkt. 14), and on November 8, 2016, the Commissioner cross-moved for the same, (Dkt. 17). Both motions were taken on submission and marked fully submitted on December 15, 2016.

## The Administrative Record

The Social Security Administrative Record, (Dkt. No. 13), filed as part of the Commissioner's answer, sets forth the following history.

Saenz was born in May 1974 and has completed high school. (R. at 42, 133.) Prior to his current alleged disability, Plaintiff worked a variety of jobs, including as a warehouse worker, stockperson, machine operator, roofing laborer, janitor, forklift operator, handyman, and parking lot attendant. (R. at 158, 197.) Since adolescence, Plaintiff has had substance abuse problems, and for many years sold drugs to support himself. (R. at 262-63, 766, 783.) Plaintiff maintains regular visitation with his young daughter, with whom he does activities such as bicycling, swimming, watching movies, and going to the library. (R. at 52, 167, 171.)

a. 2010 Records

On May 2010, Saenz was hospitalized at Arden Hill Behavioral Health Unit of Orange Regional Medical Center for depression and anxiety. (R. at 859-63.) Upon admission, Saenz tested positive for cannabis, and later acknowledged that he had relapsed into using cocaine and alcohol. (R. at 766, 783, 861.) He was admitted with a diagnosis of bipolar disorder and polysubstance dependence. (R. at 859.) While there, Saenz received substance abuse counseling and medication management from Catholic Charities; with therapy and medication, Saenz's

3

condition improved, and he was discharged. (R. at 853, 861-62, 917-20, 1077, 1079, 1082.)

Starting in June 2010, while continuing his therapy at Catholic Charities, Saenz was admitted into an individual and group counseling program called Personalized Recovery Orientated Services ("PROS"), a part of Occupations, Inc. ("Occupations") (R. at 262-267.) Through PROS, Saenz received counseling from Jennifer Candela, a licensed clinical social worker. (Id.)

In August 2010, Catholic Charities discharged Saenz for repeatedly missing or arriving late to appointments, in addition to their suspicion that Saenz was not following his prescription regimen. (R. at 918.) That same month, Saenz was also incarcerated for several days for violating an order of protection. (R. at 835.) While incarcerated, Saenz did not have access to medication, which exacerbated his anxiety and required another hospitalization at Orange Regional Medical Center after his release from prison. (R. at 738-86, 853.)

On September 13, 2010, at the request of the SSA, Dr. Leslie Helprin conducted a consultative psychiatric evaluation of Saenz. While there, Saenz reported that he was able to dress, bathe, groom himself, cook, clean, do laundry, shop, drive, use

4

public transportation, and socialize with friends and family.
(R. at 789.) Dr. Helprin observed that Saenz had adequate social
skills and motor behavior, was appropriately dressed, made eye
contact, and was well-groomed. (R. at 788.) Saenz was "fluent
and clear with word-finding" and had "coherent and goal
directed" thought processes "with no evidence of hallucinations,
delusions, or paranoia." (Id.) His mood was dysthymic and affect
dysphoric. (Id.) Saenz's intellectual skills were "below average
range," his insight was "limited," and his attention and
concentration capacity was present but "impaired." (Id.) Dr.
Helprin believed that Saenz would have "difficulty dealing
appropriately with stress of an independent job in a competitive
workplace due to depression." (R. at 789.) Nevertheless, Dr.
Helprin concluded that Saenz's judgment was "fair," he could
"maintain a regular schedule," and that he "would be able to
maintain attention and concentration for a simple rote task in a
supported work setting." (Id.)

On October 6, 2010, State agency medical expert Dr. L.
Meade reviewed Dr. Helprin's report and other contemporary
treating sources. (R. at 837-40.) Dr. Meade noted that Saenz
suffered from moderate limitations on his ability to complete a
normal workday and respond appropriately to changes in the
workplace. (R. at 838.) However, Dr. Meade concluded that Saenz

was able to "understand, execute and remember simple instructions and work like procedures." (R. at 839.) Similarly, Saenz could "sustain attention, concentration and pace for a normal work day and work week," "relate adequately to supervisors and coworkers," and "use judgment to make simple work related decisions." (Id.)

Despite his discharge from Catholic Charities, Saenz continued at PROS under the counseling care of Ms. Candela and medication management care of Dr. Muhammad Malik. (R. at 262-67, 793-802.) Saenz's medication was adjusted during this time, principally due to Saenz's leukopenia, but by October was stabilized, and Saenz's mental status and judgment were evaluated as normal, though Saenz remained depressed and anxious. (R. at 637, 794, 807.) Towards the end of 2010, Saenz's attendance at PROS dropped and then stopped altogether; only after Ms. Candela sent Saenz a letter warning of potential discharge from PROS did Saenz resume regular attendance, treatment, and medication. (R. at 940-45.)

b. 2011 Records

Treatment at PROS continued throughout 2011. (R. at 429-33, 435-541, 949-1028, 1030-36, 1038-48.) For the first half of

2011, Ms. Candela noted that Saenz regularly attended his counseling sessions and successfully managed his depressive symptoms, even when periodically taken off medication due to his leukopenia. (R. at 951, 955, 975.) Saenz regularly visited his daughter and volunteered at church twice a week. (R. at 954, 958, 960, 968, 972, 982, 1000.)

By mid-2011, both Ms. Candela and Dr. Malik encouraged Saenz to search for full-time employment. (R. at 982, 1000.) In response to the suggestions, Saenz stated that he was not ready to return to work, (R. at 983), and that he was unwilling to work for "that hard for $10.00 an hour" when he had gotten use to "making 'mad money' when he was dealing drugs." (R. at 1000.)

In July 2011, after a period of renewed drug abuse, including cannabis and cocaine, and heightened depression, Saenz was admitted back to Orange Regional Medical Center at the recommendation of Ms. Candela. (R. at 866, 868, 871, 1004.) Upon admission, Saenz reported feeling overwhelmed, anxious, and hearing voices. (R. at 876.) Saenz resumed medication and therapy, after which his condition improved and stabilized. (R. at 876.) He was discharged about a week later with a diagnoses of schizoaffective disorder-depressed. (Id.)

7

In September 2011, because of Saenz's increased reports of
depression, PROS doctors recommended Saenz transfer to
Occupations' partial hospitalization program, where he received
more intensive, daily support. (R. at 1019, 1021.) Saenz
remained there for about two months. (See R. at 1034.) While
there, Saenz minimally participated or attended programming,
though he continued to attend and volunteer at church and was
focused on an upcoming visitation rights hearing regarding his
daughter. (R. at 1021-22, 1025, 1027-28.)

Through the end of 2011, Saenz continued to meet with Dr.
Malik and other PROS medical professionals to manage his
medication. (R. 497-508, 506, 511, 516-20, 522-27 530-31, 536-
39.) The doctors reported that Saenz occasionally experienced
auditory hallucinations but that he was able to ignore them and
that his thought process continued to be goal directed. (R. at
499, 506, 511, 518, 524, 530, 536.) While Saenz reported
anxiety, lack of motivation, and feelings of being overwhelmed,
(R. at 506, 519, 524, 530-31, 536), the doctors observed that he
was alert and oriented, with fair concentration, fair attention
span, and intact memory. (R. at 499, 518, 524, 530, 536, 606.)
Dr. Malik again recommended to Saenz that Saenz should return to
work. (R. at 506.)

In October 2011, after not following his medication prescriptions and returning to drug abuse, Saenz was readmitted to Orange Regional Medical Center for depression and reports of hallucinations and paranoia. (R. at 884-900.) After resuming his medication regimen, Saenz's condition improved and stabilized. (R. at 893.) After being discharged, Saenz was transferred back to PROS for continued therapy and medication management. (R. at 462-75, 478-84, 1029, 1034.)

In December 2010, Dr. Salil Kathpalia took over responsibility for Saenz's psychiatric treatment and medication management. (R. at 429-32, 440-54.) Dr. Kathpalia observed that Saenz was cooperative, with normal speech, though process, and thought content. (R. at 431, 442, 448.) Saenz's judgment and memory were intact and his attention span and concentration were good. (R. at 431, 442, 448.) He only reported having auditory hallucinations once. (R. at 443.) Saenz also continued to see Ms. Candela for counseling. Saenz expressed to Ms. Candela his desire for money to provide better for his daughter and observed that he "'might not be able to continue to wait around for SSI to be approved[,]' and might[,] therefore[,] 'have to get a job." (R. at 1038.) However, he stated that he did not want to do "dirty work for slave wages," which included work like "labor, cleaning, [or] retail." (Id.)

c. 2012 Records

During January and February 2012, Ms. Candela's session notes for Saenz noted his depressive mood and low self-esteem, which Saenz tied to his lack of finances and poor quality of life. (R. at 1050, 1052-53.) Ms. Candela repeatedly suggested that Saenz seek employment, which Saenz stated he was able, but unwilling, to do. (See R. at 1049-50, 1052-53, 1056, 1063, 1065, 1068.) Saenz expressed irritation that Dr. Kathpalia would not provide him a letter stating that Saenz could not work so he would not be required to pay child support. (R. at 1065.) Saenz reported that he continued to see his family, provide child care to his nephew, assist his mother with house repairs, and attend and volunteer at church regularly. (R. at 1044, 1056.) Saenz had also returned to using marijuana. (R. at 1055.) Ms. Candela reported that she believed Saenz was using the PROS program to avoid working. (R. at 1056.)

In March 2012, at Ms. Candela and Dr. Kathpalia's suggestion, Saenz was transferred out of the PROS program to Occupations' clinical program. (R. at 1065, 1068.) Saenz then began counseling sessions with Jenna Fitzpatrick, another licensed clinical social worker. (R. at 1344-68, 1370, 1375-79,

1381-82.) Ms. Fitzpatrick reported that Saenz often stated he was depressed and anxious, but that his conditions improved with medication and activity. (R. at 1345, 1347, 1350-51, 1358, 1365, 1367, 1370, 1377.) Saenz also continued to meet with Dr. Kathpalia, with whom he exhibited depressed or anxious moods, but possessed a cooperative attitude, normal speech, normal thought process, normal thought content, and lacked perceptual disturbances. (See R. at 271, 277, 285, 292, 298, 306, 313, 320, 327, 334, 343, 350, 357, 371, 378, 383, 389, 395, 401, 407, 413, 419, 426, 1095, 1126, 1143, 1155, 1160, 1167, 1173, 1179, 1185, 1204, 1210, 1216, 1222.) Dr. Kathpalia's notes consistently indicate that Saenz's memory and judgment were intact and his attention span and concentration were good. (Id.)

On August 31, 2012, Dr. Helprin conducted another evaluation of Saenz. (R. at 711-15.) Dr. Helprin noted that Saenz exhibited normal motor behavior, adequate social skills, and coherent, goal directed thought processes without evidence of hallucinations. (R. at 712-13.) Saenz's attention, concentration, and memory were impaired, and his intellectual skills were below average. (R. at 713.) Saenz stated his daily activities were sometimes impeded by his depression, though he also stated he continued to perform daily chores like bathing, grooming, dressing, cooking, cleaning, shopping, laundry,

11

driving, and reading. (Id.) Dr. Helprin concluded that Saenz could perform "simple rote tasks and some complex tasks independently," "maintain attention and concentration for simple tasks with difficulty," and was "able to make appropriate decisions now without his substance abuse." (R. at 714.) However, Dr. Helprin noted that depression "may significantly interfere with [Saenz's] ability to function on a daily basis" and was impacting his ability to maintain a "regular schedule." (Id.)

On November 2, 2012, State agency medical expert Dr. J. Dambrocia reviewed Saenz's record. (R. at 716-35.) Dr. Dambrocia noted that Saenz had moderate limitations on maintaining social functioning and concentration, which might result in Saenz having difficulties relating with others, adapting to change, or dealing with coworkers. (R. at 726, 733.) Dr. Dambrocia also concluded that Saenz would be able "to understand and remember instructions and sustain attention and concentration for tasks," and his ability to tolerate and respond appropriately to supervision would be "adequate to handle ordinary levels of supervision in the customary work setting." (R. at 733.)

d. 2013 Records

Saenz remained under Dr. Kathpalia's care through September 2013. Meeting almost every other week, Dr. Kathpalia observed that Saenz would generally be depressed or anxious, but otherwise possessed normal speech, thought processes, and thought control, and exhibited intact judgment, good attention span, and good concentration. (R. at 1115, 1189, 1196, 1246, 1252, 1260, 1266, 1274, 1281, 1292, 1300, 1306, 1314, 1320.) Medication and counseling continued through mid-2013, and Dr. Kathpalia and Ms. Fitzpatrick reported Saenz showed signs of overall improvement, aside from occasional conflicts with family members or failure to take medication, each which resulted in periods of increased depression. (R. at 1323, 1329, 1331, 1334, 1335, 1339.)

On July 20, 2013, Ms. Fitzpatrick completed a psychiatric assessment of Saenz for the Orange County Department of Social Services. (R. at 910-11.) Ms. Fitzpatrick noted that Saenz had limitations with regard to understanding and remembering complex instructions, maintaining attention and concentration, and performing low stress, simple tasks. (R. at 911.) Ms. Fitzpatrick noted no limitation on Saenz's ability to maintain socially appropriate behavior, basic standards of personal

13

hygiene or grooming, or the ability to use public transportation. (R. at 911.) Ms. Fitzpatrick stated that Saenz had improved with treatment, but it was undetermined when he may return to work "due to chronic bipolar disorder." (R. at 910-11.)

On September 26, 2013, Dr. Kathapalia completed a mental residual functional capacity assessment of Saenz. Dr. Kathpalia observed that Saenz had moderate limitations with regard to maintaining attention and concentration for periods of greater than two hours, performing activities within a schedule, maintaining regular attendance, working in coordination with others without distraction, completing a normal work week without interruption, responding appropriately to change in the work place, and accepting instruction and responding appropriately to criticism from supervisors. (R. at 1388-90.) Saenz was found not significantly limited in his ability to: remember, understand, and carry out short and simple instructions; remember locations and work procedures; get along with co-workers without distracting them; maintain socially appropriate behavior; and adhere to standards of neatness and cleanliness. (Id.) Dr. Kathpalia stated that Saenz would need "a supportive environment to be successfully employed" and would

need to be absent from work about two times per month. (R. at 1391-92.)

### e. Saenz's Hearing Testimony

On October 8, 2013, Saenz, accompanied by counsel, testified before the ALJ. Saenz testified about his feelings of depression, paranoia, and of being overwhelmed. (R. at 46, 50, 60.) He discussed his feelings of low self-worth and how his depression made him feel "stuck," preventing him from engaging in activities outside the house. (R. at 59, 61.) He described his difficult relationship with his daughter. (R. at 50.) He testified that he heard voices and had suicidal thoughts, for which he had been hospitalized. (R. at 61-62.)

### f. Post-Hearing Record

Following the hearing, the ALJ wrote to Dr. Kathpalia to clarify and understand better the basis of the doctor's September 2013 evaluation. (R. at 237-42.) Dr. Kathapalia's answers, as well as correspondence with Plaintiff's counsel regarding these additions to the regard, were entered into the record without objection and prior to the ALJ's consideration and decision. (R. at 13, 243-48, 1393-99.)

**Applicable Standard**

a. Review of the Commissioner's Decision

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted); see also 42 U.S.C. § 405(g). "Substantial evidence" must be "more than a mere scintilla. It means such relevant information as a reasonable mind might accept as adequate to support a conclusion." Talavera, 697 F.3d at 151 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). When determining whether the agency's findings were supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Id. (internal quotation marks omitted) (quoting Mongeur v. Heckler, 722 F.3d 1033, 1038 (2d Cir. 1983) (per curiam)).

"Substantial evidence" is a "very deferential standard of review—even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir.

2012) (citation omitted). While the ALJ's decision needs to contain enough information to "glean [the ALJ's] rationale," it is not required to "have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." Mongeur, 722 F.2d at 1040 (citations omitted). "[O]nce an ALJ finds facts," this Court can "reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (internal quotation marks and citation omitted) (emphasis in original). It is not for this Court to "substitute its own judgment for that of the [Commissioner]," even if it might justifiably have reached a different result upon *de novo* review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).

### b. Standard Of Disability

In order to establish a disability within the meaning of the Act, a claimant must demonstrate the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42

U.S.C. § 423(d)(1)(A). Under the Act, it is not sufficient that
the claimant establish the mere presence of a disease or
impairment. Rather, he must show that the disease or impairment
has caused functional limitations that preclude him from
engaging in any substantial gainful activity. Rivera v. Harris,
623 F.2d 212, 215-16 (2d Cir. 1980); Coleman v. Shalala, 895 F.
Supp. 50, 53 (S.D.N.Y. 1995).

Congress has established the type of evidence necessary to
prove the existence of a disabling impairment by defining a
physical or mental impairment as "an impairment that results
from anatomical, physiological, or psychological abnormalities
which are demonstrable by medically acceptable clinical and
laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). The
statute further provides that an individual will be determined
to have a disability "only if his physical or mental impairment
or impairments are of such severity that he is not only unable
to do his previous work but cannot, considering his age,
education, and work experience, engage in any other kind of
substantial gainful work which exists in the national economy."
42 U.S.C. § 423(d)(2)(A).

To determine disability, the Commissioner uses a five-step
sequential evaluation process. 20 C.F.R. § 404.1520. If a

finding of disability or non-disability can be made at any point in the sequential analysis, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a); Williams v. Apfel, 204 F.3d 48, 48-49 (2d Cir. 1999).

At step one, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the claimant is not engaged in substantial gainful activity, the analysis moves to step two where the Commissioner considers whether the claimant has a "severe" impairment or combination of impairments that significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521; Bowen v. Yuckert, 482 U.S. 137 (1987).

If a severe impairment or combination of impairments is present, at step three the Commissioner considers whether the claimant's impairment meets or equals the criteria in Appendix 1 to 20 C.F.R. Part 404, Subpart P. See 20 C.F.R. § 404.1520(d). If the claimant does not have a listed impairment, the Commissioner will make a finding regarding the claimant's residual functional capacity, i.e., what a claimant can do despite his impairments and related symptoms. 20 C.F.R. §§ 404.1520(e), 404.1545.

The Commissioner then uses the residual functional capacity finding at the fourth and fifth steps of the sequential evaluation. Id. At the fourth step, the Commissioner determines whether the claimant has the residual functional capacity to perform his past relevant work. 20 C.F.R. § 404.1520(f). The claimant bears the burden of proving that he cannot return to his former type of work. See Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). If the claimant is unable to perform any work he has done in the past, the Commissioner considers his residual functional capacity along with his age, education, and past work experience to determine if he can do other substantial gainful activity in the national economy. 20 C.F.R. § 404.1520(g). If a claimant can do other work, the claim will be denied. Id.

## The Commissioner's Motion For Judgement On The Pleadings Is Granted

### a. The ALJ Did Not Err In The Weight Given To Plaintiff's Treating Physician

Plaintiff contends that the ALJ committed legal error when he gave insufficient weight to the evaluations of Dr. Kathpalia and Ms. Fitzpatrick, whom Plaintiff terms his treating physicians. After reviewing the record, the ALJ gave the evaluations of Dr. Kathpalia and Ms. Fitzpatrick "very little

weight" (R. at 22-23.) These weight determinations were not legal error.

The treating physicians rule "generally requires deference to the medical opinion of a claimant's treating physician." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). However, a treating physician's opinion is only entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." Burges v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks omitted) (alternation in original) (quoting 20 C.F.R. § 404.1527(d)(2)); see also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion, . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."). Licensed physicians are statutorily acceptable medical sources; licensed clinical social workers are not, though qualify as "other sources" that may be used as evidence to show a claimant's severity of impairment and ability to function. See Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995) (citing 20 C.F.R. § 404.1527); 20

C.F.R. § 404.1513(a)-(d); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *2-3 (Aug. 9, 2006).

If a treating physician's opinion is not to be given "controlling weight, the regulations require the ALJ to consider several factors . . . *inter alia*, the [l]ength of the treatment relationship and the frequency of examination; the [n]ature and extent of the treatment relationship; the relevant evidence . . ., particularly medical signs and laboratory findings, supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues." Burges, 537 F.3d at 129 (internal quotation marks omitted) (quoting 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (3)-(5)). In setting forth an opinion, the ALJ must provide "good reasons" for the different weight given to the treating source, without which the opinion should be remanded. Halloran, 362 F.3d at 32-33 (citation omitted).

Plaintiff argues that the ALJ did not give proper weight to Dr. Kathpalia's September 2013 opinion. In 2013, Dr. Kathpalia observed that the Plaintiff had moderate limitations with regard to maintaining action for two hours periods of time, performing regularly scheduled activities, punctuality, accepting

instruction, performing consistently without an unreasonable number of rests, completing normal work week without interruption, and working in coordination with or near others without being distracted. (R. 1388-90.) Plaintiff claims that the ALJ ignored the consistency of these observations with other treating source opinions in the record. According to the Plaintiff, the ALJ's weight determinations "virtually ignored" Plaintiff's repeated hospitalizations over the years and Plaintiff's continued need for multiple weekly treatment sessions. (Pl.'s Memo of Law in Supp. at 21.)

With respect to Dr. Kathpalia's work, the ALJ considered Dr. Kathpalia's evaluations of the Plaintiff from 2011 through 2013, Dr. Kathpalia's 2014 clarification letter that the ALJ had sought, and observations and comments Dr. Kathpalia had made that were noted in other treating sources' records. (R. at 22-23.) The ALJ acknowledged that Dr. Kathpalia had a "lengthy treating relationship" with the Plaintiff. (R. at 23.) However, the ALJ ultimately found that Dr. Kathpalia's September 2013 conclusions merited "very little weight" because it was inconsistent with the record as a whole.

The ALJ examined reports made over the years by different treating sources, particularly Dr. Helprin and Ms. Candela,

which conflicted with Dr. Kathpalia's findings. (R. at 19-21,
23.) The ALJ discussed Dr. Helprin's reports from 2010 and 2012,
which concluded that Plaintiff was able "to follow and
understand simple directions and instructions, perform simple
rote tasks and some complex tasks independently, maintain
attention and concentration for simple tasks, and make
appropriate decisions." (R. at 21; see R. at 714, 789.) "Some
weight" was assigned to Dr. Helprin's assessments of Plaintiff's
functional abilities, since they were more recent and based on
personal observation. (R. at 21.) However, in 2010, Dr. Helprin
stated that Plaintiff was "able to maintain a regular schedule,"
(R. at 789), but in 2012 stated that Plaintiff had "difficultly
maintaining a regular schedule." (R. at 714.) Given
inconsistencies in her reports, incongruity with the record, and
evidence of Plaintiff regularly attending program appointments,
the ALJ gave the portions of Dr. Helprin's report that discussed
Plaintiff's ability to maintain a schedule "less weight." (R. at
21.)


The ALJ looked at Dr. Candela's numerous reports from 2011
and 2012, which contained variations on the Plaintiff stating
that "'probably nothing, really'" prevented him from working,
other than it was "not one his goals." (R. at 1049.) Ms.
Candela's reports recount Plaintiff observing that he

"eventually plan[ned] to get a job," but that he could not "work all day for pennies" after making "'mad money' when he was dealing drugs," (R. at 1000), that Plaintiff "did not want to do 'dirty work for slave wages'" and "jobs he might qualify for (labor, cleaning, retail)" were "boring and beneath him," (R. at 1038), and that he was concerned about transferring to a clinic because he needed to know how "to convince the doctor in the clinic to certify him as unable to work so that he doesn't have to pay child support," (R. at 1063). Dr. Candela concluded that, despite Plaintiff stating that he was "able to volunteer or work full time," he did not want to be employed and used sessions at PROS "to avoid going to work." (R. at 1055-56.) Given the length of time spent with the Plaintiff and the amount of detail provided in each report, the ALJ gave "great weight" to Ms. Candela's opinion, which was within his discretion. (R. at 20.)

As part of his analysis, the ALJ also noted inconsistencies and infirmities in Dr. Kathpalia's own record. In 2012, Ms. Candela's report indicated Plaintiff's displeasure at Dr. Kathpalia after Dr. Kathpalia declined to sign a letter stating that Plaintiff was "not able to work at all." (R. at 1065; see R. at 20.) The ALJ highlighted how this accorded with Dr. Kathpalia's other 2013 reports, which consistently indicated that Plaintiff's attention span and concentration skills were

good and which "revealed no abnormalities in [Plaintiff's] mental health." (R. at 19; see, e.g., R. at 1189, 1196, 1246, 1260, 1266, 1274, 1281, 1292, 1300, 1304, 1314, 1320.) The ALJ's post-hearing clarification from Dr. Kathpalia revealed that Dr. Kathpalia had no expertise in evaluating an individual's functional limitations. (R. at 23, 1395.)

When analyzing the record, the ALJ did consider Plaintiff's multiple hospitalizations. (R. at 19, 23.) The ALJ observed that, while hospitalized, Plaintiff "generally presented with racing thoughts, increased anxiety or depression, psychomotor agitation, difficulty focusing, paranoia, and pressured speech." (R. at 19; see also R. at 747, 752, 755, 758, 859-61.) However, Plaintiff's progress and treatment reports indicated that Plaintiff's hospital visits often coincided with "periods of non-compliance with medications or relapses into drug and alcohol use." (R. at 19; see R. at 853, 868, 887, 890-91.) The ALJ noted that when Plaintiff was active and engaged in therapy and medication, it led to "effective control" over Plaintiff's mental state. (R. at 23; see also R. at 263, 924, 927, 1370, 1373, 1378.) Given the short periods of time Plaintiff spent hospitalized, the noted positive responses to treatment, and the evidence that Plaintiff was using therapy sessions to avoid working, the record could support the ALJ's conclusion that

Plaintiff's treatments were "essentially routine and/or conservative in nature." (R. at 23.)

The ALJ also considered Dr. Kathpalia's opinions in the context of Ms. Fitzpatrick's evidence, which the ALJ decided merited "very little weight." (R. at 22.) Ms. Fitzpatrick, a licensed social worker, is not an "acceptable medical source," and was not entitled to the presumption of controlling weight under the treating physicians rule. Diaz, 59 F.3d at 313-14; (R. at 22.) Independent of her treating history with the Plaintiff, it was in the ALJ's discretion to give her opinion "the appropriate weight . . . based on all the evidence before him." Diaz, 59 F.3d at 314; see also SSR 06-03p, 2006 WL 2329939, at *2. Ms. Fitzpatrick indicated in July 2013 that she believed the Plaintiff had limited functioning and would be unable to return to work for an "undetermined [period of time] due to chronic bipolar disorder." (R. at 911.) The ALJ found Ms. Fitzpatrick's report to be inconsistent with other treatment notes also in the record, such as those already discussed from Ms. Candela and Dr. Kathpalia. (R. at 22.) He also noted that Ms. Fitzpatrick's conclusions were inconsistent with other of her own observations. In the same July 2013 report, Ms. Fitzpatrick noted that Plaintiff had "no obvious limitations maintaining socially appropriate behavior, using public transportation, and

maintaining hygiene and grooming." (R. at 22; see also R. at 911.) And in reports written shortly after July 2013, Ms. Fitzpatrick noted that Plaintiff was "focused and engaged in [the] session" and "reported doing okay overall." (R. at 1323; see R. at 22.) A reasonable factfinder could find the record did not support Ms. Fitzpatrick's opinion, and the ALJ's weighing was not legal error. (R. at 22.)

In sum, when weighing Dr. Kathpalia's opinion, the ALJ expressly addressed each of the points now raised by Plaintiff: the reports by Dr. Helprin and Ms. Fitzpatrick, Plaintiff's hospitalization, and Plaintiff's continued attendance at meetings with therapists and psychiatrists. (Pl.' Memo of Law in Supp. 19-21.) As discussed, the ALJ's opinion contained throughout it "other substantial evidence in the record" inconsistent with the treating physician's opinion. Halloran, 362 F.3d at 32. In doing so, the ALJ "applied the substance of the treating physician rule" and provided well-supported "good reasons" that properly allowed him to discount Dr. Kathpalia's report. Id. (citation omitted); see also Botta v. Barnhart, 475 F. Supp. 2d 174, 188 (E.D.N.Y. 2007) ("Although the ALJ should 'comprehensively' set forth the reasons for the weight assigned to a treating physician's opinion, the failure to do so does not require remand if it can be ascertained from the entire record

and the ALJ's opinion that the ALJ 'applied the substance' of
the treating physician rule." (citing Halloran, 362 F.3d at 32-
33)).

## b. The ALJ's Determination Was Properly Weighed And Supported By Substantial Evidence

The ALJ found that Plaintiff possessed the residual
functional capacity "to perform a full of range of work at all
exertional levels" and could "understand, remember, and carryout
simple, routine, repetitive work, commensurate with unskilled
work, and deal with changes in a routine work setting" as well
as "occasional interact with supervisors, coworkers, and the
public." (R. at 18.) Plaintiff challenges this finding as not
supported by substantial evidence in the record and reached by
an improper assessment of the credibility of opinions in the
record, including the Plaintiff's testimony.[2]

In reaching his conclusion, both with regard to Plaintiff's
credibility and the ALJ's determination, the ALJ pointed to
years' worth of examination notes in the record indicating that
while the Plaintiff was at times depressed and anxious and

---

[2] In addition to his own testimony, Plaintiff argues that the ALJ improperly
applied little weight to the opinions of Dr. Kathpalia, Dr. Helprin, and Ms.
Fitzpatrick. As the ALJ's evaluation of and weight given to those three
individuals has already been discussed, *supra* at 24-28, those discussions are
incorporated here and need not be repeated.

occasionally exhibited poor judgment, he overall was found consistently to possess good attention span and concentration skills, a cooperative temperament, and normal speech, judgment, and thought processes. (R. at 19, 23; see, e.g., R. at 271, 277, 285, 292, 298, 306, 313, 794, 798, 801, 817-19, 1155, 1160, 1167, 1173, 1179, 1185, 1189, 1196, 1204, 1210, 1246, 1260, 1266, 1274, 1281, 1292, 1300.) Two different psychiatrists in the record had told the Plaintiff that he was capable of engaging in some form of work. (R. at 23, 982, 1065.) The ALJ relied on these assessments in concluding that Plaintiff could "at least engage in simple, routine unskilled work." (R. at 19.)

The ALJ examined evidence in the record that demonstrated Plaintiff's actions and behavior. The ALJ identified numerous comments Plaintiff had made over the years during therapy sessions, discussed supra at 24-25, that indicated Plaintiff's disability was "crafted in order to support his claim for disability and is not an accurate depiction of his true, current functioning." (R. at 23; see also R. at 19-20, 1038, 1044, 1049, 1055-56, 1063.) The ALJ noted instances of Plaintiff engaging in daily activities that would not have occurred were Plaintiff's symptoms as severe as he claimed, including "child care, . . . trips out of town, refusing to work . . . preparing his own meals, cleaning, shopping, managing money, . . . using public

transportation" and "visitation[s] with his minor daughter on a regular basis." (R. at 23; see also R. at 713.)

The ALJ considered the reviews conducted by State agency psychological consultants Drs. Meade and Dambrocia. (R. at 21.) In October 2010, Dr. Meade found that the Plaintiff had moderate difficulty in maintaining concentration, (R. at 833), but that he was able to "understand, execute and remember simple instructions and work like procedure" and could "sustain attention, concentration and pace for a normal work day and work week." (R. at 839.) In November 2012, Dr. Dambrocia made similar findings, noting that while Plaintiff had might have "difficulties relating to others" and that his "ability to deal with co-workers and the public would be somewhat reduced," Plaintiff could "handle ordinary levels of supervision in the customary work setting." (R. at 733.) Based on the consulting doctors' expertise as to SSA disability program requirements, along with a record that supported their conclusions, it was not legal error for the ALJ to give these doctors' assessments "great weight." (R. at 21); Micheli v. Astrue, 501 Fed App'x 26, 29 (2d Cir. 2012) (upholding an ALJ's decision to give greater weight to a state agency physician over a treating source when "other evidence in the record provide[d] substantial evidence [in] support").

With regard to Plaintiff's credibility, the ALJ observed

"no evidence of debilitating symptoms" during Plaintiff's

testimony, though the ALJ acknowledged the hearing was only

"short-lived and cannot be considered a conclusive indicator" of

overall functioning. (R. at 24.) However, those observations,

which were given "some slight weight," in combination with

Plaintiff's statements about how he wished to avoid work to

continue to receive SSI, his noted improvements following

medication regimens, and evidence of his active day-to-day

activities, led the ALJ to conclude that Plaintiff's allegations

and testimony were "not wholly credible." (R. at 23.)

Plaintiff argues that it was improper for the ALJ to assign

more weight to the State consultants who did not themselves

examine him while weighing less the opinions of those in the

record who did or his own opinion. SSA regulations "permit the

opinions of nonexamining sources to override treating sources'

opinions provided they are supported by evidence in the record."

Diaz, 59 F.3d at 313 n.5 (quoting Schisler v. Shalala, 3 F.3d

563, 568 (2d Cir. 1993)). As for Plaintiff's credibility, the

ALJ, "after weighing objective medical evidence, the claimant's

demeanor, and other indicia of credibility . . . may decide to

discredit the claimant's subjective estimation of the degree of

impairment." Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir. 1999).
"If the [Commissioner's] findings are supported by substantive
evidence, the [C]ourt must uphold the ALJ's decision to discount
a claimant's subject complaints of pain." Gates v. Astrue, 338
F. App'x 46, 48 (2d Cir. 2009) (quoting Aponte v. Sec'y, Dep't
of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984)).

In the record before the ALJ was substantial evidence that
Plaintiff possessed the mental, social, and physical capacity to
engage in unskilled labor with occasional interaction with
others. The ALJ analyzed a voluminous record that covered years
of psychiatric evaluations, medical evaluations, and Plaintiff's
statements from written reports and live testimony. The record
provided adequate evidence for the ALJ's well-supported
determination that Plaintiff, when adhering to a medication and
therapy regimen, could control his bipolar disorder symptoms to
the point where he could find a job, and that Plaintiff's
continued reliance on PROS and similar counseling was a tactic
to keep receiving disability benefits. (R. at 23-25); see
Cichocki v. Astrue, 534 Fed. App'x 71, 73, 77 (2d Cir. 2013)
(citation and quotation marks omitted) (rejecting bipolar
disorder disability claim supported by treating physician's
opinion when substantial evidence in the record indicated
differently).

Within the almost 1,400 record pages, Plaintiff is right

that there was evidence that could also have supported his

disability claim. However, that decision is not for this Court

to make. "Where there is substantial evidence to support either

position, the determination is one to be made by the

factfinder." Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir.

1990). The ALJ's conclusion that Plaintiff was not disabled was

adequately supported by substantial evidence, not legal error,

and must be upheld. See Talavera, 697 F.3d at 153.

## c. The Plaintiff Received A Full And Fair Hearing

Plaintiff contends that because the ALJ had neither a

vocational expert nor a medical expert testify at Plaintiff's

hearing, that Plaintiff was denied a full and fair hearing.

However, on this record, neither was required.

Instead of consulting a vocational expert, the ALJ applied

the Commissioner's Medical-Vocational Guidelines (the "Grid") to

determine whether Plaintiff's residual functional capacity

permits him substantial gainful employment in the national

economy given his age, education, experience, and training. The

result listed in the Grid is usually dispositive on the issue of

disability. See Heckler v. Campbell, 461 U.S. 458, 467 (1983).
An ALJ cannot rely solely on the Grid "if a non-exertional
impairment has any more than a 'negligible' impact on a
claimant's ability to perform the full range of work." Selian
v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) (quoting Zabala v.
Astrue, 595 F.3d 402, 411 (2d Cir. 2010)). "A nonexertional
impairment is non-negligible 'when it . . . so narrows a
claimant's possible range of work as to deprive him of a
meaningful employment opportunity." Id. (quoting Zabala, 595
F.3d at 411).

The ALJ found that Plaintiff's "condition did not limit
[his] ability to perform unskilled work, including carrying out
simple instructions, dealing with work changes, and responding
to supervision." Zabala, 595 F.3d at 411. This finding was
supported by substantial evidence in the record, and so sole
"use of the Medical-Vocational Guidelines was permissible." Id.;
see Zedanovich v. Astrue, 361 Fed. App'x 245, 246 (2d Cir. 2010)
(finding that in the absence of "significant limitation" in the
range of unskilled sedentary work performable by plaintiff,
testimony from a vocational expert was unnecessary); (R. at 18,
25-26).

As to the medical expert, there is no requirement that an ALJ call one. See 20 C.F.R. § 404.1527(e)(2)(iii) ("Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) . . . .") (emphasis added). Courts have considered it advisable, however, for an ALJ to call a medical expert "to resolve conflicts in the medical evidence of record or determine the significance of clinical or laboratory findings." Cole v. Astrue, No. 06 Civ. 769 (RJS)(GAY), 2013 WL 4398974, at *4 (S.D.N.Y. Aug. 7, 2013) (internal quotation marks omitted) (quoting Social Security Hearings, Appeals, and Litigation Law Manual, I-3-7-12, 1993 WL 643165 (Sept. 8, 2005)). In light of the substantial evidence in support of the ALJ's conclusions, which did not require resolving conflicts or outstanding questions of medical significance, the decision not to call a medical expert was not legal error and did not deprive Plaintiff of a full and fair hearing.

## Conclusion

For the foregoing reasons, Defendant's motion is granted and Plaintiff's motion is denied.

It is so ordered.

**New York, NY**
**May 10, 2017**

_____
ROBERT W. SWEET
U.S.D.J.